In re the Marriage of Thomas J. **CORWIN, petitioner,**
**Respondent,**

v.

**Laurel J. CORWIN, Appellant.**

**Nos. C9–84–1317, C8–84–1986.**

Court of Appeals of Minnesota.

April 16, 1985.

Nancy K. Olkon, Olkon & Olkon, Minneapolis, for appellant.

Dennis E. Grande, Ellen L. Maas, Arthur, Chapman & Michaelson, Minneapolis, for petitioner, respondent.

Heard, considered and decided by HUSPENI, P.J., and FOLEY and WOZNIAK, JJ.

## OPINION

WOZNIAK, Judge.

This is a custody dispute. The mother appeals from three separate court orders that changed custody of the child from the mother to the father, required the mother's visitation to be supervised, and permitted the father to remove the child permanently to another state. We affirm.

## FACTS

Laurel Corwin and Tom Corwin were married in June 1978. Their only child, Kristopher, was born in March 1979. The parties were divorced in July 1982. The mother was awarded physical custody of the child; the father was permitted liberal visitation. The parties had joint legal custody.

In February 1983, the father moved the court for a change in physical custody. The court denied his motion. On March 31, 1983, the father took the child to California with his second wife. This was done without the consent or knowledge of the mother and was in violation of the custody decree. The mother located the child and had him returned in August 1983.

*The June 14 Order*

The father again moved for a change in custody alleging that the mother physically abused the child. A trial ensued. By its order of June 14, 1984 the court found that:

[The mother] has spanked [the child] with her hand and with a plastic spoon and has bitten him.

[The mother] has belittled [the child], calling him 'dummy' and 'stupid'.

[The mother] failed to notice bruises on [the child's] body which were unusual in that they appeared not to have been caused by the ordinary activities of a child.

[The mother] has failed to deal with [the child's] emerging sexuality adequately. For example, when [the child] had an erection, [the mother's] reaction was to tell him, 'We don't do things like that,' when she saw him examining himself. In June, 1983, [the child] reported to [his father and stepmother] that his mother got mad 'when his pee-pee stuck out.' He also told them that his mother hit, bit and slapped his penis and taped it to his leg.

[The child's] report of sexual abuse is typical in that abused children frequently do not reveal sexual abuse while under physical control of the abuser but do tend to reveal the abuse after having been removed from control of the abuser for a period of time.

The court's findings were based on testimony by the parties and by expert witnesses. The mother admitted to spanking the child with a plastic spoon and to biting him. She did not deny belittling the child. She explained that her behavior must be observed in context; she did not intend to harm the child. One psychologist, Mindy

Mitnick, testified that the child's test results were indicative of abuse, and that the mother's test profile fit that of an abuser. The mother introduced contrary conclusions drawn by James McDonough, a child psychologist. McDonough claimed that the child had been adversely affected when father took him to California. McDonough admitted on cross-examination that his license to practice had been suspended. The child's pediatrician testified that the mother had shown proper concern for the child. But he also testified that it would be unusual for her not to have observed some of the child's bruises.

Based on its findings, the court concluded that the child's physical and emotional health were jeopardized while he was in the custody of the mother. The court awarded sole physical and legal custody to the father. The order required the child to remain in Minnesota and prohibited visitation by the mother pending an investigation by county services.

On July 7, 1984, the court modified its order by permitting the mother supervised visitation. This was the recommendation of a court-appointed psychologist, Jack Peverill. Peverill determined that the mother and child should remain near each other for visitation and resolution of the child's separation anxiety.

*The October 31 order*

Following the change of custody, the father moved the court for an order allowing him to remove the child to his new home in California. On August 1, 1984, the court denied the husband's motion and ordered county services to report on the progress of the mother's visitation.

The father renewed his request to remove the child to California. This request was the focus of an evidentiary hearing in late October. On October 31, 1984, the court granted the father's motion. Its findings were based on evidence submitted by the parties and by experts. It was found that the father now works in California at a gross annual salary of $19,500. The mother earns about $400 per month

and has expenses of approximately $490 per month.

A county services employee, Doneldon Dennis, who supervised six visits between the mother and child, reported several problems with the visitation. He concluded, "It would be best for the child if he is allowed to live with his family in California while the mother, hopefully, confronts her behavior."

Peverill, the court-appointed psychologist, reexamined the child for the October hearing and determined that the child had progressed significantly. Peverill made no recommendation at this hearing about whether removal would be detrimental to the child.

The father's expert psychologist, Ralph Underwager, testified that he had been treating the child once a week for three months prior to the October hearing. Underwager stated that removal would not affect the child adversely. Underwager concluded that the child perceives his California family as the functional family unit. "Simply put, [the child] belongs there."

The mother's expert psychologist, McDonough, submitted a report shortly before the hearing which focused on the father's negative behavior, such as taking the child to California without consent in 1983. It also indicated that the mother's prognosis was "good" with continued therapy. The report offered no opinion as to the impact of removal of the child. McDonough had not interviewed the child since prior to May 1984.

The court concluded that it was in the child's best interest to permit the move. The court ordered reasonable telephone visitation and face-to-face visitation for not less than 30 days per year. The court denied the mother's motion to have the child reinterviewed by McDonough for this hearing. The court also denied the mother's motion for a change of custody, for the appointment of a guardian ad litem, and for proceeding to appeal in forma pauperis.

## ISSUES

1. Did the court err by changing custody to the father?

2. Did the court err by requiring the mother's visitation to be supervised?

3. Did the court err in allowing the father to remove the child from the state?

4. Did the court err by denying the mother's motion to proceed in forma pauperis?

## ANALYSIS

■■ 1. The mother appeals from the June 14 order that changed custody from her to the father. A modification of custody must be based upon a change of circumstances involving the child or the custodian and also upon a determination that modification is in the best interests of the child pursuant to standards delineated in Minn. Stat. § 518.18(d) (1984).

While the child was in California for four months with his father and stepmother, several facts came to light indicating that the mother was emotionally and physically abusing him. The June 14 findings reflected an expert's opinion that abuse typically would be revealed in these circumstances. Therefore, the court concluded that the mother-child relationship had changed adversely since the original custody decree. This required the court to consider also whether a change would be in the child's best interests.

■■ In evaluating the child's best interests, the court must consider all relevant factors, including:

(c) The interaction and interrelationship of the child with his parent or parents
* * *

 *     *     *     *     *     *

(f) The permanence, as a family unit, of the existing or proposed custodial home;
(g) The mental and physical health of all individuals involved; [and]
(h) The capacity and disposition of the parties to give the child love, affection, [and] guidance * * *

Minn.Stat. § 518.17, subd. 1 (1984).

The June 14 order based on findings of child abuse reflect that the mother-child

relationship had deteriorated. Child abuse reflects adversely on the mother's mental health and on her ability to deal with the child's sexual development. Living with the mother physically and emotionally endangered the child. In contrast, there was no substantial evidence relating to the adverse impact of the proposed custodial home. These factors prominently weigh in favor of the court's decision to change custody.

We recognize that the evidence concerning the stability of the parents was conflicting. On the one hand, the father had taken the child to California in violation of the original custody decree and without the mother's consent. On the other hand, the court had abundant evidence of abuse by the mother. In view of this conflict, the court had to make numerous judgments on the basis of credibility. The trial court is uniquely situated to determine the truthfulness of a witness. Therefore, we will not disturb the court's order unless we are "left with a definite and firm conviction that a mistake has been made." *Hallom v. Carey*, 343 N.W.2d 701, 704 (Minn.Ct.App.1984).

The court's findings were thorough and sensitive to the record. They reflect that the harm caused by the child's change in environment was outweighed by the advantages to his physical and emotional well-being. *See* Minn.Stat. § 518.18(d)(iii) (1984). We do not find that the court erred by changing custody.

2. The mother appeals from the trial court's July 7 order requiring her visitation to be supervised. The July 7 order was superseded by the October 31 order which allowed the mother 30 days face-to-face visitation per year and liberal telephone visitation once the child moved to California. Based on its findings of abuse, the court approached the issue of visitation cautiously. It appointed an independent psychologist to help determine the appropriateness of visitation. In his report, Peverill found the child to be the object of considerable abuse, sexual mishandling,

and physical mistreatment. He recommended that the mother's visitation be supervised. The court did not abuse its discretion in adopting Peverill's recommendation.

3. The mother appeals from the October 31 order that allowed the father to move the child to California. The custodial parent is presumptively entitled to remove the child from the state unless the party opposing the motion establishes that removal would endanger the best interests of the child. *Auge v. Auge*, 334 N.W.2d 393, 397 (Minn.1983) (construing Minn.Stat. § 518.18(d)).

Following a full evidentiary hearing, the court drew careful findings which supported its decision to allow removal. The findings accurately reflected evidence contained in the record. The court acted properly in adhering to the presumption in favor of removal. *Auge*. The mother did not meet her burden of proof of showing that the harm caused by removal outweighed advantages to the child.

The mother argues that the court prevented her from meeting her burden of proof because it did not allow her expert psychologist, McDonough, to interview the child. Instead, the court ordered the independent psychologist, Peverill, to reevaluate the child for the October hearing. The court's decision was reasonable because Peverill was neutral. In fact, three months earlier he had recommended that the child remain in the state. Based upon his observations of the child's emotional development, Peverill did not conclude that the move would be harmful at this time. The court acted reasonably in relying on this expert, rather than allowing the mother to put in testimony of an expert hired by her.

The mother requested a guardian ad litem for the child at the October 31 hearing. The court's decision to appoint a guardian is discretionary under Minn.Stat. § 518.165 (1984). A guardian would be desirable in light of evidence that the parties in their animosity sometimes overlook the best interests of the child. This, in

fact, was Peverill's observation. The motion for a guardian, however, was brought long after the court and its services became involved in this matter. Seasoned experts had been intensely involved with counseling the family. The evidence showed that the family relationships had stabilized by October. Therefore, the court was not in error by denying the mother's request.

The mother also requested a change in custody at the October 31 hearing. There has been no adverse change in circumstances since the court initially granted the husband custody in June 1984. The court did not err by denying the request. The mother also requested that the father and his new wife be restrained from discussing the move with the child. This issue is moot.

4. Due to unusual circumstances, the mother's appeals from the June 14 order, the July 7 order, and the October 31 order have resulted in two separate hearings before the same panel of judges on the Court of Appeals. With respect to the first hearing, the trial court determined that the mother may proceed in forma pauperis based on findings that she was indigent and that the issues were not frivolous.

The mother requested permission from the trial court to proceed in forma pauperis for the second appellate hearing which involved only matters raised by the October 31 order. The court denied her request. The mother already has paid the appeal bond, the filing fee, and the transcript costs for the second appeal. This demonstrates her ability to pay. The court did not err by denying the mother's motion.

## DECISION

1. The court did not err by changing custody.

2. The court did not err by requiring the mother's visits to be supervised.

3. The court did not err by allowing the father to remove the child from the state.

4. The court did not err by denying the mother's motion to proceed in forma pauperis.

We affirm.